IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SI POWER, LLC,

                Plaintiff,

vs.

PATHWAY HOLDINGS MANAGEMENT V, LLC, a Delaware Limited Liability company, and JAMES PLANTE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Civil Action No. 15-6101 (ES) (JAD)

**DECLARATION OF MICHAEL MAYMAN IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER**

<u>**ELECTRONICALLY FILED**</u>

Michael Mayman declares under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the sole member and managing member of Plaintiff SI Power, LLC ("SI Power"), the plaintiff in the above referenced action (the "Action"). I submit this declaration in opposition to the motion of defendants Pathway Holdings Management V. LLC ("Pathway Holdings" or "Defendant Pathway") and James Plante ("Plante, and together with Pathway Holdings, the "Defendants"), (1) to transfer the Action to the federal district court in the Southern District of California ("Defendants' Motion to Transfer") and (2) to dismiss, in part, the Complaint (the "Motion to Dismiss") insofar as the Court considers it and/or other materials outside of the Complaint. I submit this declaration based on my personal knowledge.

2. This Action principally concerns Defendants' failure to honor the terms of the July 2014 Stock Purchase Agreement between SI Power and Pathway Holdings (the "July 2014 Stock Purchase Agreement" or "Agreement") pursuant to which Pathway Holdings was

obligated to pay SI Power $2,501,369.76 in two equal payments of $1,250,684.88 -- the first at closing (the "Closing Payment") and the second on or before October 29, 2014 (the "Deferred Payment") -- in exchange for SI Power's tender to Pathway Holdings of 1,174,352 shares of Series C Preferred Stock of Pathway Genomics Corporation (the "Pathway Genomics Stock").

3. Defendants do not dispute that the payment of $1,250,684.88 is and has been contractually due to SI Power since October 2014. Defendants do not dispute that such funds were contractually due to be delivered to the same designated SI Power account, per my instructions, to which the initial, Closing Payment had been made two months earlier. Nevertheless, Defendants have refused payment, withholding and effectively misappropriating those funds due to SI Power, requiring SI Power to expend legal fees and resources, with Defendants justifying the theft of those funds on the basis of a fabricated and unsubstantiated excuse, and raising my serious concerns that the funds will no longer be recoverable once a judgment can be obtained.

4. As set forth in the Complaint, in 2011, SI Power had invested in the Pathway Genomics Stock (the "2011 Stock Purchase"), paying the same $2.13 per share price and approximately $2.5 million aggregate purchase price for the stock, as it would later agree to accept for the 2014 re-sale of such stock to Pathway Holdings.

5. As the sole member and managing member of SI Power in or about July 2011, I negotiated and executed the agreement for the 2011 Stock Purchase, and delivered the approximately $2.5 million in purchase price funds, and received the Pathway Genomics Stock, all on behalf of SI Power, as investor.

6. Defendants at no time have challenged my authority to consummate the 2011 Stock Purchase or execute the agreement related to it (the "2011 Pathway Genomics Stock

Purchase Agreement") on behalf of SI Power, or my authority to deliver the approximately $2.5 million in purchase price funds on behalf of SI Power.

7. As the sole member and managing member of SI Power, in or about July 2014, I negotiated and executed the agreement for the July 2014 Stock Purchase Agreement on behalf of SI Power, as buyer.

8. Defendants at no time have challenged my authority to execute the July 2014 Stock Purchase Agreement on behalf of SI Power in July 2014, or to deliver the Pathway Genomics Stock to Pathway Holdings, or to receive the $1,250,684.88, initial Closing Payment on behalf of SI Power.

9. Instead, Defendants have withheld delivery of the remaining $1,250,684.88 Deferred Payment to SI Power, based on the convoluted hearsay assertion that some identified person had "notified" Plante that I had been "removed as a Managing Director and agent for SI Power" by other purported members of SI Power, by action taken subsequent to the July 2014 Stock Purchase Agreement.

10. Defendants' purported justification for breaching the Agreement and failing to deliver the Deferred Payment rests entirely on hearsay and other inadmissible "evidence." In the Declaration of James Plante, dated August 12, 2015 in support of Defendants' Motion to Transfer (the "Plante Declaration" or "Plante Dec."), Plante has stated that, after Pathway Holdings had wired the initial Closing Payment, Plante allegedly was "notified" (i) that I had "misappropriated" the funds from that payment and (ii) that I had been "removed as a managing director of SI Power" by "all of the other members of [SI Power]."

11. Aside from being pure hearsay, the Plante Declaration and Defendants' moving papers fail even to identify any person who allegedly "notified" Plante of such claims, or when

3

and under what circumstances the purported communication occurred, let alone submit any sworn declaration from any such person presenting such allegations in admissible form.

12. Similarly, the Plante Declaration submits an unauthenticated hearsay document which is labeled as, and which Defendants' purport to be, SI Power board meeting minutes of a special meeting, dated August 23, 2014, which Defendants present as evidence that I was "removed as a Managing Director an agent" of SI Power, albeit after the execution and closing of the July 2014 Stock Purchase Agreement.

13. In his declaration, Plante states merely that he had "been provided" the document, but, again, fails to identify by whom or when and under what circumstances he was provided with the attached document. Nor does Plante (and nor can Plante) offer any facts about the creation or authenticity of the document itself – for instance, who created the document, in what country and precisely where was it created, when and how was it created and under what circumstances, where were the alleged participants on this "special board meeting teleconference" when it allegedly occurred, and where were they when they allegedly signed the document?[1]

14. Similarly, in the Plante Declaration, Plante has stated that he is "informed and believe[s] that Michael Mayman is merely one of four members of Plaintiff, and holds a 5% ownership interest in Plaintiff," unaccompanied by any genuine evidence to support such a claim (as is the case, with certain similar allegations in Defendants' Cross-Complaint).

---

[1] In the unsworn Cross-Complaint filed by Defendants in this Action, annexed to their attorney Declaration of Russell Winslow in support of their motions (the "Cross-Complaint"), Defendants assert that the purported meeting minutes were obtained by unidentified "agents" of one of the Russian nationals who the Cross-Complaint asserts might have rights with respect to SI Power – once again, relying on "evidence" which is hearsay, unattributed and unauthenticated. See Cross-Complaint, 22.

4

15. Consequently, while Defendants have sought to confuse the record to be considered by the Court on their motion to transfer and partial motion to dismiss, such inadmissible, unauthenticated hearsay allegations deserve no consideration.

16. Further, with respect to Defendants' Motion to Transfer this case to California, Defendants disregard the operative facts, and the *actual* agreement under which SI Power is suing for breach of contract (the July 2014 Stock Purchase Agreement), and, instead, rely on a California choice of venue provision in a contract (the 2011 Pathway Genomics Stock Purchase Agreement) which is not even the basis for a breach of contract claim in the Complaint.

17. In the context of its earlier dealing with Plante and Pathway Genomics, SI Power had agreed to a contract -- the 2011 Pathway Genomics Stock Purchase Agreement -- which contained a California choice of law provision and a California choice of venue provision, selecting the courts located in San Diego, California as the venue for disputes arising from that agreement.

18. In 2014, however, when SI Power was seeking to sell back SI Power's stock holdings in Pathway Genomics to Plante's entity, Pathway Holdings, SI Power negotiated and executed the July 2014 Stock Purchase Agreement which did *not* contain a provision for the selection of either California law or venue.

19. In fact, an initial draft of the Agreement contained a provision for California law to apply to disputes arising out of the Agreement, but SI Power had that provision replaced with a Delaware choice of law provision in the final Agreement, and SI Power did not agree and would not have agreed at that time to a provision requiring SI Power to litigate in California if Pathway Holdings failed to deliver the full payment or otherwise breached the Agreement. See Exhibit A hereto (July 23, 2014 Draft Stock Purchase Agreement). Consequently, SI Power

5

24. At all relevant times, Plante and Pathway Holdings were well aware that they were dealing with a New Jersey-based counter-party, SI Power, and me, its owner and principal, a New Jersey resident, with no relationship to California.

25. Pathway Holdings and Plante had numerous contacts with SI Power related to the allegations and claims in the Complaint which established the nexus of this dispute with the State of New Jersey – contacts between myself and Mr. Plante, and between our attorneys and representatives, by numerous telephone and electronic communications, and meetings in both New York and New Jersey. On that basis, Defendants can claim no surprise or undue inconvenience from their having to defend this Action in New Jersey.

26. Nor have Defendants set forth any facts which weigh strongly in favor of this case being adjudicated in California, rather than in the Plaintiff's chosen forum of New Jersey.

27. Defendants have not identified witnesses or evidence which are located in California as opposed to in New Jersey or other locations. Indeed, Defendants' allegations and manufactured excuse for dishonoring the Agreement and refusing to deliver the Deferred Payment, have more of a connection to New Jersey then California – inasmuch as Defendants claim that my contact, including my undertaking legal, banking and financial transactions on behalf of SI Power in <u>New Jersey</u>, was somehow unauthorized and subject to challenge by other SI Power "members," none of whom are alleged to reside in California.

28. Indeed, Defendants' own Cross-Complaint bolsters the point that the motion to transfer the Action to California is misplaced. It asserts that "[t]o avoid paying approximately $1.25 million to an unauthorized party, Mr. Plante and Pathway holdings seek a judicial determination as to which member or members of SI Power are authorized to act on its behalf," suggesting that the purported question (albeit a fabricated question), concerns me, a citizen of

New Jersey, and individuals vaguely alleged to have rights in SI Power who are citizens of Russia – no one in California. See Cross-Complaint, 8 and 34. The Cross-Complaint alleges that even Mr. Plante resides in Nevada, not California (and that Pathway Holdings, by virtue of its sole member's domicile, is a citizen of Nevada). Id. at 2, 8.

29. Yet, Defendants' argument to transfer the Action principally rests on their misplaced reliance on the California choice of venue provision in an earlier agreement which is not the contract under which SI Power is suing Defendants.

30. In light of all of the foregoing facts and circumstances, I respectfully submit that it would be unreasonably inconvenient for the Court to require SI Power to litigate this Action in California and that all relevant considerations and interests weigh in favor of the adjudication of this Action in New Jersey where it was properly filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Date: September 8, 2015

_____
Michael Mayman

# EXHIBIT A

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement ("Agreement") is entered into as of July 23, 2014, by and between SI Power LLC, a Delaware limited liability company("Seller"), and Pathway Holdings Management, LLC, a Delaware limited liability company ("Buyer"), and is entered into with reference to the following facts:

A.  Seller is the record owner of 1,174,352 shares of Series C Preferred Stock (the "Shares") of Pathway Genomics Corporation, a Delaware corporation (the "Corporation").

B.  Buyer has indicated a willingness to purchase the Shares for the consideration set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises contained in this Agreement, the parties agree as follows:

1.  Purchase. Subject to the terms and conditions of this Agreement, and effective as of the date set forth in Section 5 below (the "Closing" or "Closing Date"), Buyer will purchase from Seller all of Seller's right, title and interest in and to the Shares.

2.  Stock Certificate. Seller shall deliver the certificate(s) evidencing all of the Shares to Buyer at the Closing, fully endorsed in favor of Buyer, or provide an assignment separate from certificate that is sufficient, in Buyer's sole judgment, to transfer ownership of the Shares to Buyer.

3.  Consideration

3.1  Total Consideration. The total consideration to be paid to Seller by Buyer for the Shares ("Total Consideration") shall be:

(a)  $2.13 per share for a total of Two Million Five Hundred One Thousand Three Hundred Sixty Nine Dollars and Seventy Six Cents ($2,501,369.76), payable as follows:

  (i)  $1,250,684.88 shall be payable by wire transfer at the Closing;

  (ii)  $1,250,684.88 shall be payable by wire transfer on the 90th day following the Closing; plus

(b)  an amount equal to fifteen percent (15%) of any profit Buyer ultimately receives from the sale of the Shares ("Profit").

Buyer agrees to remit the Profit portion of the consideration to Seller within 30 days following the sale of the Shares.

(c) In the event Buyer does not pay the consideration described in Section 3.1(a)(ii) on or prior to the 90th day following the Closing, Buyer shall return certificates representing one-half of the Shares to Seller and Seller's sole remedy for such non-payment shall be to accept such Shares.

4. <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date, as follows:

4.1 <u>Title to the Shares</u>. Seller is the record and beneficial owner of the Shares. The Shares are not subject to any pledge, right of first refusal or similar condition and can be freely transferred to Buyer without the consent of any person. Buyer will receive good and marketable title to the Shares, free and clear of all liens, security interests, pledges, assessments, levies, restrictions, options, rights of first offer or refusal, voting trusts or agreements, proxies, encumbrances, marital or community property interests or other claims or charges of any nature whatsoever.

4.2 <u>No Reliance on Buyer</u>. Seller is relying solely on its own diligence, investigation and other determinations in agreeing to sell the Shares for the Purchase Price and in determining to proceed with the transaction contemplated by this Agreement at such price. Seller specifically acknowledges that its representative is a member of the Corporation's Board of Directors and is familiar with the current condition and future prospects of the Corporation.

4.3 <u>Binding Obligations</u>. The Agreement, when executed and delivered by Seller, will be the valid and binding obligation of Seller enforceable in accordance with its terms.

4.4 <u>Non-Contravention; Consents</u>. The execution, delivery and performance by Seller of this Agreement does not and will not (with or without notice or lapse of time) (a) contravene, violate, conflict with or result in any breach of any of the provisions of, constitute a default under, result in the creation of any rights of termination or acceleration of or cancellation of, or result in the creation of any lien under, any contractual obligation of Seller or any requirement of law applicable to Seller; (b) contravene, violate or conflict with any judgment, injunction, writ, award, decree or order of any nature of any governmental authority against, or binding upon, Seller; or (c) require consent, approval, order, notice or authorization of, or registration, qualification, designation, declaration or filing with, any governmental authority or any other person in connection with the execution, delivery and performance of this Agreement.

4.5     Purchase Price; Taxes.

(a)     Seller understands and agrees that the price being paid by Buyer hereunder has been negotiated and agreed, and that the value of the Shares now or in the future may be significantly higher than the price paid by Buyer under this Agreement. Seller understands that the Corporation has been in active discussions with potential investors or acquirors and may enter into a financing, acquisition or other transaction (a "Financing") after the date of this Agreement that may have a valuation that is greater than the price being paid for the Shares pursuant to this Agreement, and Buyer may participate as an investor in the Financing, should it occur. Seller also understands that the Corporation may redeem or repurchase Shares held by certain equity holders of the Corporation after the date of this Agreement at a repurchase price that may be a materially greater price. Seller hereby acknowledges that, depending on market conditions, the Corporation may file a registration statement with the SEC in connection with a proposed public offering of securities of the Corporation. The initial offering price of securities of the Corporation in such public offering would likely be substantially greater than the Total Consideration received by Seller hereunder. Seller agrees that that it will have no claims, rights, damages or entitlements of any kind against Buyer regarding any future sale of the Shares or other securities of the Corporation at a price greater than the Total Consideration.

(b)     Seller acknowledges that Seller has had the opportunity to review this Agreement with legal counsel and has had the opportunity to review the federal, state and local tax consequences to Seller of the transactions contemplated by this Agreement with Seller's tax advisors. Seller is relying solely on such advisors and not on any statements or representations of Buyer, the Corporation or any of their agents. Seller understands that Seller (and not Buyer or the Corporation) shall be responsible for Seller's own tax liability, if any, that may arise as a result of the transactions contemplated by this Agreement.

4.6     Continuing Rights. Seller hereby acknowledges that Seller shall have no interests in, or rights with respect to, the Shares as an equity holder of the Corporation or otherwise, including without limitation with respect to any future sale, acquisition, merger, liquidation, dissolution or other corporate event regarding the Corporation or its assets (any of the foregoing, a "Corporate Event"). Seller further expressly acknowledges that any such Corporate Event may result in the payment by the Corporation or a third party of assets, funds or other proceeds to the Corporation's equity holders, including Buyer, in a manner such that the value attributed to the Corporation's securities in such Corporate Event (either in an aggregate amount or on a per share basis) may be greater than the purchase price hereunder. Seller hereby acknowledges and agrees that Seller shall have no right to or interest in any such assets, funds or proceeds, solely as they pertain to the Shares, and further agrees that Seller will not make any claim or assert any right or interest, against Buyer, the Corporation or such third party with respect to any such assets, funds or proceeds (or with respect to the Corporate Event to which such assets, funds or proceeds relate) in connection with the Shares. All references to Seller in this Section 4.6 shall be deemed to include Seller's Related Parties. For purposes of this Agreement, "Related Parties" shall

mean, as applicable to each party to this Agreement or the Corporation, current and former directors, officers, partners, employees, attorneys, agents, successors, current and former equity holders (including current and former limited partners, general partners, stockholders and management companies), owners, representatives, predecessors, parents, affiliates, creditors, associates, subsidiaries, heirs, family members, executors and agents.

4.7 <u>Disclosure of Information</u>. Seller has received all the information that Seller considers necessary or appropriate for deciding whether to sell the Shares to Buyer pursuant to this Agreement. Seller further represents that Seller has had an opportunity to ask questions and receive answers from the Corporation and its management regarding the business, properties, prospects and financial condition of the Corporation. Seller acknowledges (i) that neither Buyer nor Buyer's Related Parties have made any representation or warranty, express or implied, except as set forth herein, regarding any aspect of the sale and purchase of the Shares, the operation or financial condition of the Corporation or the value of the Shares, (ii) that Seller is not relying upon the Corporation or Buyer or Buyer's Related Parties in making its decision to sell the Shares to Buyer pursuant to this Agreement, (iii) that Buyer is relying upon the truth of the representations and warranties in this Section 4 in connection with the purchase of the Shares hereunder, (iv) that Seller has entered into this Agreement based on Seller's own investigation and analysis and that of Seller's advisors, and (v) that Seller has reviewed this Agreement.

4.8 <u>Broker's Fees</u>. No agent, broker, investment banker, person or firm acting on behalf of or under the authority of Seller is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the transactions contemplated herein.

4.9 <u>Approvals/Authority</u>. Seller represents that: (a) Seller is a member managed limited liability company in good standing in the State of Delaware; (b) Michael Mayman is the sole member of the company; (c) Seller has obtained all member and/or third party approvals necessary for the consummation of the sale of the Shares to Buyer; and (d) Mr. Mayman is duly authorized to execute this Agreement on behalf of Seller.

5. <u>Seller Releases.</u> 5.1 <u>Information Release</u>. Seller acknowledges that Buyer or Buyer's Related Parties may now possess or may hereafter possess non-public information concerning the Corporation not known to Seller (the "Excluded Information") including, without limitation, information which Buyer or Buyer's Related Parties may have received from the Corporation on a confidential basis or information received from other sources. The Excluded Information may or may not be material, may or may not have been publicly disclosed by or on behalf of the Corporation, and may or may not be available to Seller from sources other than the Corporation, Buyer or Buyer's Related Parties. Seller hereby:

(a) agrees that neither Buyer or Buyer's Related Parties nor the Corporation or the Corporation's Related Parties shall have any liability to Seller with respect to, based upon,

arising from, resulting from, or relating to directly or indirectly the existence, substance, possession, disclosure, or nondisclosure of any Excluded Information whatsoever with respect to the Shares, whether arising directly or indirectly, primarily or secondarily, by contract or operation of law or otherwise, including, without limitation, as a matter of contribution, indemnification, set-off, rescission, or reimbursement;

(b) waives any right, claim or cause of action at law or in equity with respect to, arising from, based upon, resulting from or relating to directly or indirectly the existence, substance, possession, disclosure or nondisclosure of any Excluded Information, including, without limitation, pursuant to Sections 10(b) and 20A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or the rules and regulations promulgated by the Securities and Exchange Commission under the Exchange Act, or of any state statute or regulation, and relinquishes all rights and remedies accorded by applicable law to a seller of securities with respect to the Shares to the maximum extent permitted by law, as well as all rights to participate in any claim, action or remedy others may now or hereafter have with respect to the foregoing; and

(c) hereby and forever releases and discharges Buyer and Buyer's Related Parties and the Corporation and the Corporation's Related Parties of and from any and all suits, demands, obligations, liabilities, claims and causes of action, contingent or otherwise, of every kind and nature, at law and in equity, whether asserted, unasserted, absolute, contingent, known or unknown, which Seller may have against Buyer, Buyer's Related Parties, the Corporation or the Corporation's Related Parties, or any of them, to the extent arising from, relating to directly or indirectly, based upon, resulting from, or in connection with the existence, substance, possession, disclosure or nondisclosure of any Excluded Information.

5.2   Release.

(a) For and in consideration of the amount paid to Seller under this Agreement, Seller, on Seller's own behalf and on behalf of Seller's Related Parties, hereby fully, finally and irrevocably releases the Corporation, the Corporation's Related Parties, Buyer, Buyer's Related Parties and their respective assigns and any future holder of the Shares and waives any and all rights, actions, obligations, claims, liabilities, obligations, damages and causes of action whether known, suspected or unknown, whether in law or in equity which Seller may have or may claim to have against the Corporation, the Corporation's Related Parties, Buyer, Buyer's Related Parties or their respective assigns or any future holder of the Shares, resulting from and/or related in any way to Seller having been a holder of the Shares, or to Seller's sale of the Shares or to any other relationship Seller has ever had with the Corporation in any capacity (the "Seller Causes of Action").

(b) In executing this Agreement, Seller acknowledges that (1) Seller has performed its own analysis of the price at which Seller would agree to sell the Shares and (2)

Seller has been informed that the Corporation may from time to time enter into agreements for additional types of financing, including without limitation recapitalizations, mergers and initial public offerings of securities of the Corporation, and also may pursue acquisitions or enter into agreements for the sale of the Corporation or all or a portion of the Corporation's assets, which may result in or reflect a substantial increase in equity value, enterprise value or the purchase price per Share, and that any and all claims arising from or relating to such transactions or such increases in equity value, enterprise value or purchase price per Share (without limitation) are encompassed within the scope of this release.

(c) Seller hereby represents that Seller has consulted with counsel with respect to the execution and delivery of this release and has been fully apprised of the consequences hereof. Furthermore, Seller agrees not to institute any litigation, lawsuit, claim or action against Buyer or of any Buyer's Related Parties or the Corporation or any Corporation Related Parties or their respective assigns with respect to the released Seller Causes of Action. Seller represents that Seller has access to adequate information regarding the terms of this Agreement, the scope and effect of the releases set forth herein, and all other matters encompassed by this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement.

(d) Seller acknowledges that Seller may hereafter discover facts different from or in addition to those now known or believed to be true regarding the subject matter of the release in this Section 5.2 and agrees that such release shall remain in full force and effect, notwithstanding the existence or nature of any such different or additional facts.

SELLER (ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES) EXPRESSLY WAIVES AND RELINQUISHES ALL RIGHTS AND BENEFITS AFFORDED BY SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH STATES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THIS RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

6. Closing Date. The Closing Date shall occur on or before close of business on July 30, 2014..

7. Confidentiality. Seller represents that neither it, nor any of its employees or agents, has disclosed any of the terms of this Agreement to any third party other than its attorneys, accountants and employees with a strict need to know and who have signed employee confidentiality agreements ("Permitted Recipients"). Seller covenants that neither it, nor any of its employees or agents, will in future, disclose any of the terms of this Agreement to any third

party other than Permitted Recipients. In the event that Seller breaches the representations or covenants contained in this Section 8, Seller will forfeit its right to receive the Profit portion of the consideration for the Shares.

8. Miscellaneous.

8.1   Governing Law. This Agreement shall be governed in all respects by the laws of the State of California without regard to conflict of law principles.

8.2   Survival. The representations, warranties, covenants and agreements made herein shall survive any investigation made by Buyer and the closing of the transactions contemplated hereby.

8.3   Successors and Assigns. Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto and shall inure to the benefit of and be enforceable by each person who shall be a holder of the Shares from time to time.

8.4   Entire Agreement. This Agreement constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein. This Agreement supersedes any prior or contemporaneous oral or written agreement between the parties regarding the sale of the Shares.

8.5   Severability. In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

8.6   Amendment and Waiver. This Agreement may be amended or modified only upon the written consent of Seller and Buyer.

8.7   Delays or Omissions. It is agreed that no delay or omission to exercise any right, power or remedy accruing to any party, upon any breach, default or noncompliance by another party under this Agreement shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance, or any acquiescence therein, or of or in any similar breach, default or noncompliance thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character on any party's part of any breach, default or noncompliance under this Agreement or any waiver on such party's part of any provisions or conditions of the Agreement must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement, by law, or otherwise afforded to any party, shall be cumulative and not alternative.

    8.8    Notices. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (c) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to Seller or Buyer at their addresses as set forth on the signature page hereof or at such other address as Seller or Buyer may designate by ten (10) days' advance written notice to the other parties hereto.

    8.9    Expenses. Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of the Agreement.

    8.10    Titles and Subtitles. The titles of the sections and subsections of the Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

    8.11    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by signatures delivered by electronic transmission.

    8.12    Third Party Beneficiaries. The Corporation and its Related Parties are intended third-party beneficiaries of the releases contained in Sections 5.1 and 5.2 hereof and the representations and warranties contains in Section 4 hereof and may take all action in law or equity as may reasonably be necessary to enforce such provisions.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"Seller"

SI POWER LLC
a Delaware limited liability company

By: Michael Mayman
Title: Sole Member

Address: _____

_____

"Buyer"

PATHWAY HOLDINGS MANAGEMENT, LLC,
a Delaware limited liability company

By:_____
    James Plante, Manager

Address: 7770 Regents Rd, Suite 113-293, San Diego, CA 92122